UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JACOB BEATY and JESSICA BEATY,

Plaintiffs,

v.

FORD MOTOR COMPANY,

Defendant.

C17-5201 TSZ

ORDER

**REDACTED**[1]

THIS MATTER comes before the Court on Plaintiffs Jacob and Jessica Beaty's motion for class certification, docket no. 68.  Plaintiffs have also filed motions to exclude certain expert testimony offered by Defendant Ford Motor Company ("Ford"), docket nos. 108 and 114; and Ford has moved to exclude certain expert testimony offered by Plaintiffs, docket nos. 122, 124, 126, and 131.  Having reviewed all papers filed in support of, and in opposition to, the motions, the Court enters the following Order.[2]

---

[1] This Order is a redacted version of the Sealed Order, docket no. 243, filed on July 8, 2021.  Pursuant to the Court's Minute Order, docket no. 244, the parties provided the Court with a proposed redacted version of the Sealed Order, and the Court has adopted in full the parties' proposed redactions.

[2] The Court initially anticipated scheduling oral argument on these pending motions, *see* Minute Order at ¶ 2 (docket no. 239), but concludes that the relevant facts and legal issues are adequately presented in the parties' extensive briefing and supporting documents.

ORDER - 1

**<u>Background</u>**[3]

In February 2017, Plaintiff Jessica Beaty was driving her 2013 Ford Escape when the vehicle's panoramic sunroof ("PSR"), which is an enlarged or expanded sunroof, suddenly shattered for no apparent reason, causing glass to fall on Jessica and her young daughter.  *See* Compl. at ¶¶ 2, 72 (docket no. 1).  In March 2017, Jessica and her husband, Jacob, brought this putative class action based on the alleged defects of the PSRs installed in the following Ford and Lincoln models and model years that comprise of the "Class Vehicles":  2007–2014 Ford Edge, 2013–2017 Ford Escape, 2011–2017 Ford Explorer, 2007–2015 Lincoln MKX, 2010–2017 Lincoln MKT, and 2009–2016 Lincoln MKS.  *See* Compl. at ¶ 18; Stip. Mot. to Amend Class Definition & Order (docket no. 65 at 1–2).

In February 2020, Judge Leighton granted summary judgment in favor of Ford and dismissed the action.  *See* Order (docket no. 228).  Plaintiffs appealed the dismissal of their common law claim for fraudulent concealment or nondisclosure (Count 2) and a claim under the Washington Consumer Protection Act ("CPA"), chapter 19.86 RCW (Count 3).  *See* Compl. at ¶¶ 103–25; Notice of Appeal (docket no. 229).  While the appeal was pending, Judge Leighton retired, and the case was reassigned.  *See* Minute Order Reassigning Case (docket no. 233).

In April 2021, the Ninth Circuit reversed the summary judgment order, concluding that, with respect to the fraudulent concealment claim, there is a triable issue of material

---

[3] Because the parties are familiar with the facts and extensive procedural history, the Court only briefly recites the relevant background information in this Order.  *See also* Order (docket no. 46) & Order (docket no. 228) (summarizing the relevant facts).

fact regarding whether Ford knew about the risk that the PSRs would spontaneously shatter in its 2013 Ford Escape model; and with respect to the CPA claim, a reasonable juror could find that the risk of a spontaneously shattering PSR is material to consumers. *See* Mem. Dispo. at ¶¶ 1, 2 (docket no. 237).

On remand, this Court acknowledged that the instant motions, including Plaintiffs' motion for class certification (docket no. 68) and the parties' motions to exclude certain expert opinions (docket nos. 108, 114, 122, 124, 126, & 131), which were previously denied as moot, *see* Order (docket no. 228), are now ripe for review.  Minute Order (docket no. 239).  Although the parties each filed notices of supplemental authority, *see* docket nos. 240 & 242, they indicated that additional briefing on the pending motions is unnecessary.  *See* Joint Status Report (docket no. 241 at 1).

This Order first addresses the parties' motions to exclude certain expert opinions, docket nos. 108, 114, 122, 124, 126 & 131, and then turns to Plaintiffs' motion for class certification, docket no. 68.

**Discussion**

**1.      Motions to Exclude Expert Testimony**

**A.      Admissibility Standard**

Federal Rule of Evidence ("FRE") 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if" (i) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (ii) "the testimony is based on sufficient facts or data," (iii) "the testimony is the product of reliable principles and methods," and (iv) "the expert

has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(a)–(d).  The FREs "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).  In determining whether expert testimony is reliable, a court may consider certain factors, such as testing, peer review, error rates, and acceptability in the relevant scientific community.  *Id.* at 593–94. Nonetheless, "[c]hallenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge.'"  *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014).

### B.  Plaintiffs' Motion to Exclude Defendant's Expert Dr. Paul Taylor (docket no. 108)

Plaintiffs concede that Ford's expert, Paul Taylor, Ph.D., is qualified to testify about certain topics as a mechanical engineer, but they argue that Dr. Taylor's testimony should be excluded for failure to satisfy the relevance requirement under FRE 702 and *Daubert*.  Dr. Taylor's testimony is certainly relevant, however, as his opinions respond to the primary contention of Plaintiffs and their experts that an alleged common defect exists among the Class Vehicles' PSRs.  Dr. Taylor opines that there are "significant differences" among these PSRs, such as differences in the PSRs' sizes, locations, and configurations, "affect[ing] both the probability and severity of an impact to the PSR glass panels from road debris."  Taylor Expert Report, Ex. A to Taylor Decl. (docket no. 92 at 35).  Plaintiffs' challenge goes to the weight of Dr. Taylor's opinions, not their admissibility.

Plaintiffs also argue that Dr. Taylor's testimony is unhelpful, because "[j]urors need no assistance to understand that the [Class] Vehicles vary in length, width, height,

off-road capabilities, and size, curvature and setback of the PSRs."  Reply (docket

no. 210 at 3).  Yet, Dr. Taylor's analysis of the rate of PSR shattering events goes beyond

his alleged lay descriptions of the PSRs' design differences.  *See* Taylor Expert Report

(docket no. 92 at 35).  Dr. Taylor relied on his rock model testing, as well as his

concurrent analysis of claim rates and part-replacement data, to validate his visual

observations of the differences among the PSRs.  *See id.*  Dr. Taylor's tested observations

of significant differences among the PSRs would thus "help the trier of fact to understand

the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a); *see also Daubert*, 509

U.S. at 591 ("Rule 702's 'helpfulness' standard requires a valid scientific connection to

the pertinent inquiry as a precondition to admissibility.").  The Court concludes that

Dr. Taylor's testimony is both relevant and helpful under FRE 702, and therefore

DENIES Plaintiffs' motion to exclude his testimony, docket no. 108.

### C.    Plaintiffs' Motion to Exclude Defendant's Expert Dr. Justin McCrary (docket no. 114)

Plaintiffs do not dispute that Justin McCrary, Ph.D., an economist, is qualified to

opine on issues related to classwide damages, and they do not appear to challenge his

critique of Plaintiffs' experts' proposed methodology for calculating classwide damages.

Plaintiffs instead argue that Dr. McCrary's methodology, which relies on *used* Class

Vehicles, is not reliable because it cannot determine the diminution in value of *new* Class

Vehicles at the original point of sale.  For similar reasons, Plaintiffs argue that

Dr. McCrary's testimony is unhelpful and likely to mislead the factfinder.

Even assuming that Dr. McCrary's methodology cannot reliably calculate class

members' original point-of-sale damages, *see In re FCA US LLC Monostable Elec.*

*Gearshift Litig.*, 382 F. Supp. 3d 687, 695–96 (E.D. Mich. 2019), his analysis of resale

data is nonetheless a reliable proxy to determine whether class members who later sold their Class Vehicles suffered any damages. Dr. McCrary explains that if owners of the Class Vehicles were experiencing the defect, or if news of the defect had reached the public, "there would be supply-side and/or demand-side shifts that would lead to lower prices for" the used Class Vehicles; and that "if prices of used [Class Vehicles] do not decline relative to prices of appropriate comparison vehicles, it suggests that the alleged defect did not move market prices" in the secondary market. McCrary Expert Report at ¶ 58, Ex. A to McCrary Decl. (docket no. 94). Dr. McCrary opines that "since [Class Vehicles] tend to retain their value at least as well over time as comparison vehicles," they "do not depreciate more rapidly." *Id.* at ¶ 59. Given that Plaintiffs' proposed class includes all persons who purchased a Class Vehicle in Washington, regardless of whether they later sold the vehicle, *see* Pls.' Mot.. to Certify Class (docket no. 68 at 7), Dr. McCrary's analysis indicates that the class members who sold their Class Vehicles did not experience any defect-related diminution in value—meaning, any alleged overpayment that these class members allegedly made at the original point of sale would have been passed on to the buyer of the used Class Vehicle, causing those class members to suffer no damages at all.

The Court concludes that Dr. McCrary's reasoning is "based on objective, verifiable evidence and scientific methodology of the kind traditionally used by experts in the field." *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002); *see, e.g.*, *Sanchez-Knutson v. Ford Motor Co.*, 181 F. Supp. 3d 988, 996 (S.D. Fla. 2016) (concluding that Ford may present evidence to the jury concerning the active secondary market for the vehicles at issue "in an attempt to refute [p]laintiff's damages evidence").

Dr. McCrary's resale-data analysis rests on a reliable foundation and is relevant to the

damages claims, particularly with regard to class members who have since sold their

Class Vehicles.  The Court DENIES Plaintiffs' motion to exclude certain opinions of

Dr. McCrary, docket no. 114.

> ### D. Defendant's Motion to Exclude Plaintiffs' Expert Neil Hannemann (docket no. 122)

Ford contends that Neil Hannemann, a mechanical engineer, does not have the

specific qualifications to offer his opinions, and that some of his opinions are not reliable

because they rest on false assumptions or insufficient data.

Ford acknowledges that Hannemann has 40 years of experience in the automotive

industry.  *See* Hannemann Decl. at ¶¶ 6–9, Attachments A & B (docket no. 70).

Hannemann served as chief engineer of the Ford GT in 2002 and was responsible for

approving the final selection of the windshields and/or "mid glass" for production and

other glazing processes.  *Id.* at ¶ 10.  In 2008, Hannemann performed a design analysis

study for another company, analyzing the use of a certain material in automotive glazing;

and he was responsible for selecting windshields and/or glazing processes for at least two

other companies.  *Id.* at ¶¶ 11–13.  Hannemann also served as technical director of a

convertible vehicle project and was involved in the design reviews for a "removable

piece of glass," though not a sunroof.  Hannemann Dep., Ex. A to Wallace Decl. (docket

no. 129-1 at 17).  Moreover, Hannemann has testified as an expert in previous cases

regarding sunroofs or PSRs.  *Id.* at 3–4.  Although Hannemann has never been directly

responsible for designing or engineering a sunroof or PSR, the Court concludes that

Hannemann's knowledge, skill, experience, training, and education renders him qualified

to opine on issues relating to automotive glass, including whether the Class Vehicles' PSRs are defective.  *See* Fed. R. Evid. 702(1).

The Court thus turns to whether Hannemann's opinion of a common defect or the dangers of that defect rests on a reliable foundation.  Ford maintains that Hannemann did not inspect or test a single Class Vehicle.  Hannemann clarified in his deposition, however, that he had not personally inspected the Class Vehicles in the "last two months since [he] started working on this case," but he had personally inspected at least some of the Class Vehicles within the "last year sometime" in connection with "other cases" on which he was working.  Hannemann Dep. (docket no. 129-1 at 14–15).  Hannemann further explained that he was familiar with the design of the Class Vehicles' PSRs and their installation; reviewed customer reports, descriptions, and photos of the Class Vehicles' PSR shattering events; and estimated incidence rates using Class Vehicles' PSR replacement rates, based on data produced by Ford.  Hannemann Decl. at ¶¶ 20–22, 25–26, 28–29, 35 (docket no. 70); Hannemann Dep. II, Ex. B to Wallace Decl. (docket no. 129-1 at 32–33).  Hannemann's reliance on such materials and data, as well as his reliance on automotive design principles and industry safety standards, including those promulgated by the National Highway Traffic Safety Administration ("NHTSA"), *see* Hannemann Decl. at ¶¶ 36–39, undermines Ford's argument that his opinions are based on mere speculation, false assumptions, or insufficient data.

Although Ford takes issue with Hannemann's use of the factory PSR replacement rate as a proxy for incidence rate (because PSRs may be replaced for reasons unrelated to the alleged defect), Hannemann explains that the PSR replacement rate might actually *underestimate* the incidence rate if, for example, consumers replace the defective PSR

1   with a recycled part. *Id.* at ¶ 28.  Any dispute over Hannemann's reliance on the PSR

2   replacement rate, or his rather general conclusion that Class Vehicles' PSR replacement

3   rates are "higher than [he] would expect to see in a non-defective sunroof" and what

4   "would be considered acceptable in the automotive industry," *id.* at ¶ 29, thus goes to the

5   weight of Hannemann's opinions, not their admissibility.[4]  The Court DENIES Ford's

6   motion to exclude Hannemann's testimony.

7          **E.     Defendant's Motion to Exclude Plaintiffs' Expert Steven Gaskin
                     (docket no. 124)**

8          Ford primarily challenges the testimony of Steven Gaskin on the ground that his

9   conjoint damages model does not reflect supply-side considerations.  Because Ford

10  makes the same argument with respect to Plaintiffs' other damages expert, Colin Weir,

11  the Court addresses this particular argument in connection with both experts; additional

12  issues relating solely to Weir are discussed in the next section.

13         Ford appears to acknowledge the appropriateness of measuring classwide damages

14  by evaluating what a reasonable consumer would have been willing to pay for the product

15  had the defect been known to the consumer in the "but-for world."  *See Pulaski &*

16  *Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015) (upholding plaintiff's

17  proposed method to calculate damages under California's consumer protection laws,

18  which measured "the difference between what [was] paid and what a reasonable

19  consumer would have paid at the time of purchase without the fraudulent or omitted

20

21  _____

22  [4] A district court in Ohio recently excluded Hannemann's similar opinions as unreliable.  *See Kondash v. Kia Motors Am., Inc.*, No. 15-cv-506, 2020 WL 5816228, *10–11 (S.D. Ohio Sep. 30, 2020).  However, this Court concludes that the jury, not the Court, must assess the credibility of Hannemann's statements

23  that he has previously inspected certain Class Vehicles or that he rested his opinions on acceptable standards in the automotive industry.  *See City of Pomona*, 750 F.3d at 1044.

information").  Instead, Ford challenges Gaskin and Weir's decision to measure *only* consumer willingness to pay for the Class Vehicles, i.e., demand-side considerations, without appropriately accounting for the supply-side considerations that would have affected market prices in the but-for world.  Ford argues that Gaskin and Weir's conjoint survey "need[s] to introduce supply-side factors, including information on the reactions of Ford's competitors to the disclosure of the alleged defect (and how those reactions in turn affect Ford's incentives)."  Def.'s Mot. to Exclude Gaskin (docket no. 124 at 11).

District courts often disagree about whether to exclude (or discredit) conjoint models such as the one at issue here, models in which the supply is fixed in historical terms despite an alleged change in demand.  *Compare, e.g.*, *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1106 (N.D. Cal. 2018) (concluding that Gaskin's proposed conjoint analysis adequately accounts for supply-side factors and does not merely measure demand-side, willingness-to-pay damages); *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 954 (C.D. Cal. 2015) (same), *with, e.g.*, *In re Gen. Motors LLC Ignition Switch Litig.*, 407 F. Supp. 3d 212, 238 & n.12 (S.D.N.Y. 2019) (rejecting expert's conjoint analysis as evidence of plaintiffs' damages and noting that because it was proffered as evidence of market value, as opposed to merely being offered to prove willingness-to-pay, it "would be" excludable under FRE 702); *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1119 (C.D. Cal. 2015) (same).

For purposes of the motion to exclude these experts' conjoint model, the Court finds *Hadley* and *In re Conagra Foods* more persuasive.  Ford simply disagrees with Gaskin and Weir about whether Plaintiffs' proposed conjoint model, which attempts to measure market value or consumer demand in the "but-for world," *should* incorporate

certain supply-side information.  As Weir has explained, the proposed methodology would measure the supply of Class Vehicles as "fixed as a matter of history," or based on actual purchases, because fixing the supply in this manner in consistent with the body of literature on this subject, including "Hedonic regression literature."  Weir Dep., Ex. B to Dawson Decl. (docket no. 127-1 at 8); Weir Rebuttal Report at ¶ 43, Ex. 1 to Terrell Decl. (docket no. 179-1).  Weir further explained that "[m]odeling the supply side in any way in which the class did not actually purchase the [Class] Vehicles makes little sense."  Weir Rebuttal Report at ¶ 43.  Gaskin's and Weir's refusal to speculate as to what Ford's competitors would have done in the but-for world, or what Ford would have done in response to its competitors' actions, does not render the conjoint model unreliable.  Such disputes go to the weight that should be afforded to the experts' model, not its admissibility.

The Court also rejects Ford's arguments that are specific to Gaskin, who is indisputably qualified to design and perform the conjoint survey.  *See* Gaskin Decl. at ¶¶ 2–3 & Ex. 1 (docket no. 73).  Ford argues that Gaskin's testimony should be excluded because he has so far failed to conduct the survey, asking this Court to go beyond the *Daubert* standard to assess the *admissibility* of Gaskin's testimony and apply the "rigorous analysis" standard to assess whether class certification is appropriate.  *See* Reply (docket no. 205 at 9–10).  Ford merely confuses these standards:  The Court will turn to the latter standard in resolving the motion for class certification, but such an analysis is distinct from the question of whether the survey satisfies *Daubert*'s reliability requirement.  *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011).  The Court concludes that the proposed conjoint survey is sufficiently reliable to calculate

classwide damages and it will not be excluded at this stage in the proceedings.  *See In re ConAgra Foods*, 90 F. Supp. 3d at 1031.

Nor will the Court exclude Gaskin's testimony or parts thereof on the ground that his survey allegedly suffers from methodological shortcomings, including whether it properly characterizes the alleged defect, uses an overinflated defect rate, or improperly relies on a generic "Ford SUV" label to describe the Class Vehicles.  Again, such criticisms go to the weight that should be afforded to the survey, but it does not warrant its exclusion at the class certification stage.  *See Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1037–38 (9th Cir. 2010) (explaining that regardless of a survey's shortcomings, such criticisms "go to 'issues of methodology, survey design, reliability, . . . [and] critique of conclusions' and therefore 'go to the weight of the survey rather than its admissibility'") (citation omitted).  The Court DENIES Ford's motion to exclude Gaskin's testimony, docket no. 124.

## F.    Defendant's Motion to Exclude Plaintiffs' Expert Colin Weir (docket no. 126)

With respect to Weir, Ford repeats its argument that his and Gaskin's conjoint model is unreliable because it does not account for supply-side factors.  For the reasons discussed in Section 1(E) above, the Court rejects this argument.  Ford also argues that Weir's testimony should be excluded because he did not sufficiently participate in the design or execution of the proposed conjoint survey and that Weir's calculations are unhelpful to the factfinder.

Weir, as an expert in conjoint analysis, was asked by Plaintiffs "to determine whether it would be possible to calculate economic damages" and, more specifically, "to work with . . . Gaskin to help design (from an economic perspective)[] and to evaluate the

ORDER - 12

economic suitability of a conjoint survey (as set forth by Gaskin) to measure the overpayment for the [Class] Vehicles at the time and point of sale and lease as a result of the [d]efect."  Weir Decl. at ¶ 7 (docket no. 72).  Weir testified that he worked closely with Gaskin to develop the survey, or parts thereof, including:  (i) determining "price ranges for use in the survey, after analyzing the [manufacturer's suggested retail price] data," (ii) discussing "how the market simulator would be structured to reflect the particular facts and circumstances of this litigation," (iii) discussing that "the supply of vehicles is fixed as a matter of history, [i.e.] the quantity," and (iv) conducting an "overall check of the survey," ensuring it "contain[s] the things necessary to calculate damages, namely, a description of the defect versus a description of the defect not [] present, various price points, [and] the use of hierarchical Bayes regression analysis." Weir Dep., Ex. D to Dawson Decl. (docket no. 127-1 at 17–18).  Weir participated in designing this conjoint survey, and Ford's argument to the contrary lacks merit.

Likewise, the Court finds unavailing Ford's argument that Weir's "rudimentary arithmetic" would be unhelpful to the factfinder.  Weir explained that his extensive work and analysis allowed him to reach the final calculation to quantify overpayment damages attributable to the defect.  Weir Decl. at ¶¶ 50–52 (docket no. 72); *see Khoday v. Symantec Corp.*, 93 F. Supp. 3d 1067, 1085–86 (D. Minn. 2015) (rejecting the argument that an expert's "methodology comprises simple calculations for which an expert is not needed" and allowing the expert to testify to his calculations applying Gaskin's conjoint analysis).  Weir's testimony would assist the factfinder in understanding *how* he reached his proposed damages calculations and thus satisfies FRE 702's helpfulness requirement. The Court DENIES Ford's motion to exclude Weir's testimony, docket no. 126.

### G.   Defendant's Motion to Exclude Plaintiffs' Expert Dr. Thomas Read (docket no. 131)

Ford moves to exclude the testimony of Thomas Read, Ph.D. on the ground that he is not qualified to opine on a common defect among the Class Vehicles' PSRs and that his testimony is unreliable, as it is based on untested hypotheses and speculation. Plaintiffs respond that Dr. Read is qualified and that any shortcomings in his testimony go to its weight, not its reliability under *Daubert*.

Dr. Read is a materials scientist, meaning he "understands the properties [of] materials and how they apply to whatever situation . . . ." Read Dep., Ex. G to Wallace Decl. (docket no. 223-1 at 118).  On June 24, 2019, Dr. Read visually inspected one make, model, and model year of the Class Vehicles, the 2016 Ford Explorer, by visiting a CarMax dealership.  Read Rebuttal Report, Ex. 2 to Terrell Decl. (docket no. 184 at 18–20).  Dr. Read also visually inspected vehicles outside the class,[5] which were manufactured with PSR assemblies from Webasto and Inalfa, like the PSRs at issue in this case.  *Id.*  Based on these inspections, Dr. Read opines that the PSRs he examined "are materially the same as the [Class] Vehicles" and that he "examined numerous PSRs that are the same as those included in the [Class] Vehicles, and it remains [his] opinion that the PSRs in the [Class] Vehicles, which are manufactured with tempered glass, are defective and that this defect is common to all of the [Class] [V]ehicles." *Id.* at 21.

---

[5] On this visit, Dr. Read also visually inspected a 2017 Ford Edge and various Kia models.  The 2017 Ford Edge is not a Class Vehicle as its PSR was not made from a single panel of tempered glass.  *See* Def.'s Mot. (docket no. 131 at 5).  When Dr. Read was asked about the 2017 Ford Edge during his deposition, he stated that he "didn't realize it was not part of the class."  Read Dep. II, Ex. E to Wallace Decl. (docket no. 130-1 at 138) (sealed).

Dr. Read has not otherwise inspected or performed testing or glass failure analysis with respect to any of the other Class Vehicles' PSRs or comparable vehicles' PSRs, at least for purposes of *this* case.  *See* Read Dep., Ex. 1 to Terrell Decl. (docket no. 184-1 at 4).[6]  During his deposition, Dr. Read stated that he did not know or has not memorized "how many [glass] panels" were in the earlier models of the Ford Edge or any of the other Class Vehicles, what the panels' sizes are, or "whether they're front panel or rear panel."  *Id.* at 16–17.  He also has not "tried to evaluate failure rates as to any type of glass in this case," or "used replacement rates or failure rates for opinions in this case."  *Id.* at 13.  Dr. Read also stated that he does not know the specific regulations promulgated by the NHTSA with respect to safety glass for automotive applications, or whether the Class Vehicles' PSRs comply with the relevant federal regulations.  *Id.* at 6–9.[7]

Recently, in *Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979 (9th Cir. 2020), the Ninth Circuit found no abuse of discretion where a district court excluded expert testimony under *Daubert* because the expert employed an "overly expansive standard for a design defect" (the expert opined that the automotive part "shouldn't fail ever" and should "last the life of the vehicle"); relied on "real world" driving tests of a small sample

---

[6] Dr. Read stated in his deposition that he had performed testing for other cases as to comparable vehicles' PSRs, but he did not include that information in any reports that he filed in this case.  *See* Read Dep. (docket no. 184-1 at 13–14).

[7] Federal regulations permit the use of tempered glass in automotive glass applications. *See* 49 C.F.R. §§ 571.205(S5.1) (FMVSS 205) & 571.5(c)(4) (ANSI/SAE Z26.1-1996); *see also Martinez v. Ford Motor Co.*, 488 F. Supp. 2d 1194, 1195 (M.D. Fla. 2007) (concluding plaintiff's claim that Ford should have designed its vehicle with laminated, rather than tempered, glass is federally preempted because the option for utilizing tempered glass is reserved under the regulatory scheme of FMVSS 205).  Instead of explaining why the use of tempered glass is inappropriate for PSR applications despite Ford's compliance with the federal regulations, Dr. Read appeared to question the government's motive for passing such regulations.  *See* Read Dep. (docket no. 184-1 at 7).

size (examining 26 of the 400,000 allegedly defective parts); found no correlation between his prior testing and the defect at issue; did not conduct comparative analyses or review replacement rates or industry data; and offered no design alternative.  *See id.* at 985–86.  The *Grodzitsky* court concluded that the expert's opinion was properly excluded as unreliable due to his "failure to utilize a workable standard supporting his design defect theory."  *Id.*

With respect to Dr. Read's opinions in particular, at least those concerning automotive glass, other courts have recently excluded or discounted his testimony.  *See, e.g.*, *Kondash v. Kia Motors Am., Inc.*, No. 1:15-cv-506, 2020 WL 5816228, at *10–11 (S.D. Ohio Sep. 30, 2020) (excluding Dr. Read's testimony because, although he had visually inspected 12 of the 22 Kia vehicles' PSRs at issue, he failed to take any measurements of his findings or conduct any tests or comparative analyses, and instead performed a "cursory inspection" of the class vehicles, resulting in mere speculation "that a common design defect existed amongst all 22 model-year vehicles"); *see also Anderson v. Ford Motor Co.*, No. 17-03244-CV, 2020 WL 1853321, at *5 (W.D. Mo. Feb. 14, 2020) (assuming for purposes of summary judgment that Dr. Read's testimony was admissible, but concluding that his testimony does not establish a design defect, as he failed to propose alternatives to Ford's PSRs and instead testified that PSRs were simply a "bad choice" as "car roofs should be made of steel").

In this case, Dr. Read is qualified to opine on general glass failure analysis, *see* Read Expert Report at ¶¶ 5–12; and there is some indication that he has previously employed reliable methodologies to assess glass failure with respect to other vehicles' sunroofs or PSRs, *id.* at ¶¶ 13–41, 43–50, 52–53.  Nevertheless, the Court concludes that

in this case, Dr. Read has either failed to proffer a reliable methodology or reliably apply his stated methodologies to the Class Vehicles' PSRs, particularly in reaching his ultimate conclusion that "[g]iven the size, thinness, curvature, ceramic print, and attachment to the unibody frame, thermally tempered glass is an inappropriate and dangerous application for" the Class Vehicles' PSRs.  Read Rebuttal Report (docket no. 184-2 at 35); *see* Read Expert Report at ¶¶ 58–65 (docket no. 71).  Dr. Read has made no attempt to explain how he reached the conclusion that these PSRs' specific features render them defective or dangerous—e.g., on which standards, methodologies, principles, or data he relied, let alone whether those standards, etc. are accepted by other experts in the automotive glass industry.[8]  Dr. Read failed to visually inspect 44 of the 45 Class Vehicles' model years; failed to perform any type of testing or comparative analyses in connection with the Class Vehicles' PSRs; and is not familiar with the features or replacement rates of the Class Vehicles' PSRs, the relevant federal regulations concerning automotive glass safety, or whether the Class Vehicles' PSRs comply with such regulations.  Dr. Read instead relies on his visual inspection of just one Class Vehicle; but even then, he was not familiar with the specific features of *that* Class Vehicle's PSR and he failed to explain why such features make the PSR defective, let alone defective across the Class Vehicles' PSRs.  *See Grodzitsky*, 957 F.3d at 986

---

[8] For example, Dr. Read stated in his deposition that although he was "critical of Ford for using the ███ ████████ tempered glass as too thin," he could not answer the question of whether a thicker panel of tempered glass would be non-defective because "there's weight considerations," he did not "know all the stress levels," and "[i]t's a very complicated question."  Read Dep., Ex. D to Wallace Decl. (docket no. 130-1 at 84–85) (sealed).

ORDER - 17

(excluding expert testimony in part because "the only testing he performed was not designed to identify any defects, let alone a common defect").

More critically, Dr. Read's opinion that certain features render the Class Vehicles' PSRs defective contradicts his repeated testimony that it is the glass material *itself* that makes the PSRs defective.  *See* Read Dep. (docket no. 184-1 at 15); *see id.* at 10–11. Throughout this litigation, Dr. Read has criticized Ford's decision to use tempered glass (or apparently any glass) in the Class Vehicles' PSRs, as he rejected the idea that an alternative sunroof design would make the Class Vehicles' PSRs "safe and not defective"; he instead opined that Ford should forgo installing sunroofs in its vehicles *altogether*, stating that Ford "should have stuck with the steel" because "all steel, obviously, isn't going to break."  Read Dep. (docket no. 184-1 at 12); *see also* Read Rebuttal Report (docket no. 184-2 at 7) ("[T]empered glass is an inappropriate replacement for more reliable steel roofs").  In other words, Dr. Read concludes that the Class Vehicles' PSRs were designed defectively either due to the use of tempered glass or due to their very existence, but he fails to cite any accepted industry standards, peer-reviewed literature, or any other authority to support his opinion relating to the dangers of using tempered glass in sunroofs or PSRs; nor does he explain why the relevant federal regulations permit the use of tempered glass in automotive glass applications.  Absent some scientific basis for Dr. Read's opinion, the Court cannot conclude that such an opinion rests on a reliable foundation.  *See Grodzitsky*, 957 F.3d at 986.

In conclusion, Dr. Read has not employed any reliable methodology to support his conclusion that the Class Vehicles' PSRs suffer from a common defect, either due to their common features or material, or their very existence in the Class Vehicles.  *See* Fed. R.

Evid. 702(c) & (d); *Grodzitsky*, 957 F.3d at 985–86; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156–57 (1999) (emphasizing that district courts must "scrutinize" whether the "principles and methods" employed by an expert "have been properly applied to the facts of the case"). The motion to exclude Dr. Read's opinion is GRANTED.

### 2. Motion for Class Certification (docket no. 68)

#### A. Class Certification Standard

"Class actions are 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 993 F.3d 774, 784 (9th Cir. 2021) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)). A party seeking class certification must meet the requirements set forth in Federal Rule of Civil Procedure 23. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011). Under Rule 23(a), the party seeking certification must first show that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). "Second, the proposed class must satisfy at least one of the three requirements listed in Rule 23(b)." *Dukes*, 564 U.S. at 345. Plaintiffs rely on Rule 23(b)(3), which requires them to show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and effectively adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Although the Rule 23 factors "have been construed permissively," courts must nonetheless "engage in a 'rigorous analysis' of each . . . factor when determining whether plaintiffs seeking class certification have met the requirements of Rule 23." *Ellis*, 657 F.3d at 980.  Resolving whether each Rule 23 factor is met "goes beyond determining whether the evidence would be *admissible* in an individual action" under *Daubert*; this rigorous analysis also requires a court to "judg[e] the persuasiveness of the evidence presented' for and against certification." *Olean*, 993 F.3d at 785–86 (quoting *Ellis*, 657 F.3d at 982).  "Courts must resolve all factual and legal disputes relevant to class certification, even if doing so overlaps with the merits." *Id.*

### B.    Plaintiffs' Proposed Class

Although Plaintiffs allege a nationwide class, the instant motion for class certification, docket no. 68, seeks to certify only the statewide class:  "all persons in Washington who purchased or leased a [Class Vehicle] with a Ford factory-installed PSR manufactured by either Webasto or Inalfa with fully tempered glass panels." Pls.' Mot. (docket no. 68 at 7).  Again, the Class Vehicles include the 2007–2014 Ford Edge, 2013–2017 Ford Escape, 2011–2017 Ford Explorer, 2007–2015 Lincoln MKX, 2010–2017 Lincoln MKT, and 2009–2016 Lincoln MKS.  Order Granting Stip. Mot. Amend Class Definition (docket no. 65 at 1–2).

### C.    Rule 23(a) Requirements

#### i.    Numerosity

As Ford appears to concede, Rule 23(a)(1)'s numerosity requirement is satisfied in this case.  *See* Ford's 4th Am. Resp. to Pls.' RFP No. 77, Ex. 56 to Mot. (docket no. 76-

49 at 4–5) (sealed); *see also* Fed. R. Civ. P. 23(a)(1) (requiring that a proposed class be "so numerous that joinder of all members is impracticable").

### ii.        Commonality

Because the test of commonality under Rule 23(a)(2) is generally subsumed by the predominance requirement under Rule 23(b)(3), the Court analyzes the common issues identified by Plaintiffs in conjunction with the Court's predominance analysis in Section 2(D)(i) below.  *See Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 627 (3d Cir. 1996), *aff'd sub nom. Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997).

### iii.        Typicality

Rule 23(a)(3) requires that a named plaintiff's "claims or defenses . . . are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).  "The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'"  *Ellis*, 657 F.3d at 984 (citation omitted).  "Typicality refers to the nature of the claim or defense . . . not to the specific facts from which it arose or the relief sought."  *Id*.

Plaintiffs argue that their claims are typical of those of the class because they were all subjected to the same alleged deceptive conduct by Ford (i.e., the failure to disclose the common defect in the Class Vehicles' PSRs), they all assert the same legal theories, and they have all been injured because of the alleged PSR defect.

Ford responds that Plaintiffs cannot satisfy Rule 23(a)(3)'s typicality requirement because their interests are antagonistic to those of the class.  Ford relies on evidence that the PSR-related claim rate made by owners of a different Class Vehicle make and model is ███████████ than the claim rate for Plaintiffs' make and model, the Ford Escape.  *See* Padmanaban Expert Report, Ex. A to Padmanaban Decl. (docket no. 97 at 14–15) (sealed).  According to Ford, the owners of that particular make and model of Class Vehicle would "have significantly [better] prospects of prevailing on their claims than ██████ owners," but they "would be forced to rely on ██████ owners, with an infinitesimally ███████████████, to vindicate their claims."  *See* Def.'s Resp. (docket no. 83 at 26).  Ford also relies on evidence that the PSR in Plaintiffs' vehicle was subjected to one or more rock strikes before the shattering event took place, suggesting that Plaintiffs would be more susceptible to certain affirmative defenses raised by Ford.  *See* Beveridge Decl. at ¶¶ 5–6, 11 & Ex. A (docket no. 88).

The Court concludes that under Rule 23(a)(3)'s "permissive standards," Plaintiffs have sufficiently shown that their claims are "reasonably coextensive with those of absent class members."  *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014).  Plaintiffs allege that they, like the other class members, were injured by Ford's alleged concealment of a common defect, and they seek to recover under the same legal theories, a common law claim for fraudulent concealment and violations of Washington's CPA.  Even if Plaintiffs are less likely to prevail on those claims based on the disparate manifestations of the alleged PSR defect, that fact alone does not defeat typicality.  *See Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (concluding that "[t]ypicality can be satisfied despite different factual circumstances surrounding the manifestation of

the defect" and plaintiffs, "like the rest of the class, may have a viable claim regardless of

the manifestation of the defect").  Nor is there anything atypical about the way in which

the alleged PSR defect in Plaintiffs' vehicle manifested itself, as Ford's own evidence

shows that rock strikes are often the cause of sunroof shattering events.  Beveridge Decl.

at ¶ 6 (docket no. 88); *cf. Hanon*, 976 F.2d at 508 (concluding that "class certification

should not be granted if 'there is a danger that absent class members will suffer if their

representative is preoccupied with defenses unique to it").  Because the nature of the

Plaintiffs' claims and the anticipated defenses asserted against them are reasonably

coextensive with the claims and defenses relating to absent class members, Plaintiffs

have met the typicality requirement.

### iv.    Adequacy

Plaintiffs must further show that they will "fairly and adequately protect the

interests of the class."  Fed. R. Civ. P. 23(a)(4).  To determine adequacy, the Court

"resolve[s] two questions: '(1) do the named plaintiffs and their counsel have any

conflicts of interest with other class members and (2) will the named plaintiffs and their

counsel prosecute the action vigorously on behalf of the class?'"  *In re Hyundai & Kia

Fuel Econ. Litig.*, 926 F.3d 539, 566 (9th Cir. 2019) (citation omitted).  The Court has not

identified any potential conflicts of interest between Plaintiffs (or their counsel) and the

proposed class members.  Plaintiffs have further shown that they will vigorously pursue

the claims of other class members.  *See* Terrell Decl. at ¶¶ 60–63, 66 (docket no. 69).

Plaintiffs have satisfied the adequacy requirement.

**D.      Rule 23(b)(3) Requirements**

**i.      Predominance**

Predominance under Rule 23(b)(3) "requires at least one common question, as does Rule 23(a)(2), but also requires that the common question, or questions, outweigh the noncommon questions." *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1304 (D. Nev. 2014); *see* 1 William Rubenstein, NEWBERG ON CLASS ACTIONS § 3:27 (5th ed. 2020 update).  An issue is common to the class if it "depend[s] upon a common contention" such that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the [class members'] claims in one stroke." *Dukes*, 564 U.S. at 350.  A plaintiff must establish predominance by a preponderance of the evidence.  *Olean*, 993 F.3d at 784.

Plaintiffs assert that at least three issues are common to the class and predominate over the noncommon issues, namely, (a) a common defect among all Class Vehicles' PSRs, (b) Ford's knowledge of and failure to disclose the defect, and (c) common injuries based on Plaintiffs' proposed conjoint damages model.  *See* Reply (docket no. 136 at 8–14); Pls.' Mot. (docket no. 68 at 15, 19–23).  The Court discusses each issue in turn.

**a.      Common Defect**

Plaintiffs assert that the "central common issue" in this case is an alleged common defect among the Class Vehicles' PSRs:  "their propensity to shatter unexpectedly and spontaneously due to the deficiencies making them unable to withstand the rigors of ordinary and expected use."  Pls.' Mot. (docket no. 68 at 15); *see* Hannemann Decl. at ¶¶ 25, 29 (docket no. 70).  Plaintiffs rely on evidence that all of the PSRs at issue were manufactured by either Webasto or Inalfa with fully tempered glass panels.  *See* Reply

(docket no. 136 at 8); Hannemann Decl. at ¶¶ 20–22 (docket no. 70).   Plaintiffs acknowledge the differences in the "height, width and shapes of the [Class] [V[ehicles, as well as the 'setback' of the PSR from the bumper," but they argue that such differences "are of no consequence" because "it does not matter how Ford placed the tempered glass on Class Vehicles, *it should not have done so at all*, regardless of location, orientation or geometry."  *See* Reply (docket no. 136 at 8–9) (emphasis added).[9]

Ford challenges Plaintiffs' assertion of a common defect, emphasizing the significant design differences in the sizes, locations, orientations, and geometries of the PSR glass installed in the Class Vehicles, as depicted below:



Taylor Expert Report (docket no. 92 at 16).  Ford also points to the statistically significant variations among the PSRs' claim rates, as the claim rate for one Class

_____

[9] Even before Plaintiffs appealed, they appeared to abandon their argument that the Class Vehicles were commonly defective due to five specific features (e.g., size, width, curvature, connection to the vehicle's unibody frame, and use of ceramic frit).  *See* Reply (docket no. 136 at 8–9).  The Court has now excluded Dr. Read's opinion that the defect was due to these specific features.  To the extent that Plaintiffs continue to rely on Hannemann's opinion that the defect is related to these five features, Hannemann repeatedly stated in his depositions that he was offering only a "safety opinion and occurrence" opinion, and that for the "actual component defect[s]" of the glass, he deferred to Dr. Read's opinions.  *See* Hannemann Dep., Ex. A to Wallace Decl. (docket no. 130-1 at 5) (sealed); *see id.* at 8, 12; Hannemann Dep. II, Ex. B to Wallace Decl. (docket no. 130-1 at 44).

Vehicle make and model ("High Risk Class Vehicle") is ███████████ than the claim rate for Plaintiffs' make and model, the Ford Escape. *See* Padmanaban Expert Report (docket no. 97 at 14–15) (sealed). The disparity in claim rates is consistent with the findings of Plaintiffs' own expert that the PSR replacement rate for the High Risk Class Vehicle is █████████ than the PSR replacement rate for Plaintiffs' make and model. *See* Hannemann Decl. at ¶ 27, Ex. 52 to Pls.' Unredacted Mot. (docket no. 76-52) (sealed).

The Court concludes that Plaintiffs have not satisfied their burden to show a common defect among the Class Vehicles' PSRs. Plaintiffs have either abandoned or not provided sufficient evidentiary support for their argument that a common PSR defect exists due to certain common design features. *See supra* note 8. Defendant's evidence more persuasively demonstrates that the Class Vehicles' PSRs' different designs, e.g., sizes, locations, setbacks, and orientations, affect the PSRs' propensities to shatter, as demonstrated by the PSRs' different claim rates and replacement rates. *See* Taylor Expert Report (docket no. 92 at 35) (explaining that the "significant differences among the PSRs . . . affect both the probability and severity of an impact to the PSR glass panels"). The varied claim rates and replacement rates do not merely show differences in the manifestation of the PSR defect, as Plaintiffs maintain, they also demonstrate that the PSRs' different propensities to shatter is in large part *because of* the PSRs' varied designs. *See id.*; Hannemann Expert Report at ¶ 20 (docket no. 70) (variations in "size of the [PSR] glass can contribute to the likelihood that it could be damaged by road debris" because the "larger size allows more exposed area available for contact" and the "larger the unsupported span, the higher [the] stresses from a given load can be"). In light of the

significant variations in the PSRs' designs and propensities to shatter, Plaintiffs have not demonstrated a common defect. *See In re Bridgestone/Firestone, Inc., Tires Prods. Liability Litig.*, 288 F.3d 1012, 1018–12 (7th Cir. 2002) (reversing class certification where the six trade names included in the proposed class definition represented 67 different designs, the various tires might have differed in their propensity to fail, some vehicles were resold and others were not, and some tires were recalled at different times); *cf. Wolin*, 617 F.3d at 1173 (concluding that plaintiffs demonstrated a common "defect exists in the alignment geometry, not the tires," despite evidence of "tire wear due to individual factors").

Nor have Plaintiffs shown by a preponderance of evidence, based on the current record, that the PSRs are commonly defective due to the use of tempered glass. The Court has excluded Dr. Read's opinion on such matters, *see* Section 1(G), as his opinion does not account for the federal regulations permitting the use of tempered glass in automotive glass applications[10] and is not based on accepted industry standards, peer-reviewed literature, or any other reliable foundation.[11]  *See Grodzitsky*, 957 F.3d at 987 (ruling that in the absence of plaintiffs' expert report, which was excluded for lack of reliability, plaintiffs' "failed to demonstrate commonality").  Even if the Court considered Dr. Read's opinion for purposes of Rule 23(b)(3)'s predominance inquiry,

---

[10] *See supra* note 6.

[11] Although Plaintiffs' other expert, Hannemann, has also suggested that the defect was due to the use of the tempered glass material itself, he stated during his deposition that he does not "know the details of the vehicles or the details of the [PSR] failure" and could not opine on "what could or could not lead to fractures of tempered safety glass in [C]lass [V]ehicles."  Hannemann Dep. II (docket no. 130-1 at 44) (sealed).

Ford's use of tempered glass is not unique to the Class Vehicles' PSRs, as other car manufacturers also used tempered glass in their PSRs.  *See* Read Rebuttal Report (docket no. 184-2 at 18–20).  If the Class Vehicles' PSRs shattered more frequently than other vehicles' PSRs, "then something in addition to the [use of tempered glass] must have brought about the defect."  *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1018 (D.C. Cir. 1986).  "That something else has not been identified as common to all Ford [PSRs] at issue"; and based on "the current record, the [tempered glass] theory still leaves [Plaintiffs] with the need to show that each [PSR] had special characteristics which, singularly or in combination, caused" the Class Vehicles' alleged PSR defect.  *See id.* at 1018–19 (vacating class certification because the district court failed to sufficiently address "how varied . . . the . . . design defect proof would likely be" under Rule 23(b)(3)).[12]  In sum, Plaintiffs' evidence is insufficient to establish a common defect.

### b.    Ford's Common Knowledge

Plaintiffs also assert Ford's knowledge of the defect is common among the class because Ford knew or should have known of the defect in all Class Vehicles since at least

---

[12] This conclusion is not in conflict with the Ninth Circuit's ruling that the PSR installed in Plaintiffs' 2013 Ford Escape is "substantially similar" to the other Class Vehicles' PSRs.  Mem. Dispo. (docket no. 237 at 6).  In concluding that the PSRs were substantially similar to the other Class Vehicles, the Ninth Circuit relied on the opinion proffered by Plaintiffs' expert that the Class Vehicles' PSRs share five common design features, including "size, thickness, curvature, connection to the vehicles' unibody frames, and use of ceramic paint or frit."  *Id.* at 5.  This expert testimony has since been excluded.  Even assuming such testimony rests on reliable foundation and should be considered for purposes of resolving the motion for class certification, the Court is tasked with conducting a "rigorous analysis" to judge the *persuasiveness* of the evidence showing a common defect.  *See Olean*, 993 F.3d at 785–86.  The Court concludes Plaintiffs' evidence is insufficient to show a common defect under this rigorous-analysis standard, regardless of whether it is sufficient to show that a reasonable juror could find Plaintiffs' vehicle's PSR to be "substantially similar" to other Class Vehicles' PSRs.

2008.  *See* Reply (docket no. 136 at 10).[13]  Plaintiffs principally rely on evidence of consumer complaints made to the NHTSA with respect to certain Class Vehicle models (and other, non-class models), beginning in March 2008; a letter dated July 25, 2014, notifying Ford of an NHTSA investigation of PSRs shattering unexpectedly in connection with a different car manufacturer and requesting information about certain Class Vehicles; and an NHTSA General Order dated April 14, 2016, notifying car manufacturers, including Ford, of its expanded investigation into shattering PSRs.  *See* Exs. 1–3 to Compl. (docket no. 1).

Ford responds that Plaintiff's evidence merely establishes that what it knew and when varied for each make, model, and model year defined as a Class Vehicle.  The Court agrees.  As discussed in Section 2(D)(i)(a) above, Ford's evidence demonstrates ██ ████████████████████████████████████████████████████████████████ ████████████████████████████████.  Padmanaban Expert Report (docket no. 97 at 22) (sealed).  For example, the PSR-related claim rates for the High Risk Class Vehicle started to ████████ in 2013, ████████ in 2014, and after Ford investigated and addressed the design issue,[14] the rate started to ████████ in 2017.  *See id.* at 18–19 (sealed); Taylor

---

[13] Based on Plaintiffs' assertion that Ford knew of a PSR defect in one of the Class Vehicles beginning in March 2008, common proof cannot be used to establish that Ford knew of the PSR defect with respect to the 2007 Ford Edge or the 2007 Lincoln MKX.  *See Coba v. Ford Motor Co.*, 932 F.3d 114, 124–25 (3d Cir. 2019) (concluding that to prevail on the theory that Ford failed to disclose a design defect, plaintiff must show that Ford had knowledge of the defect at the time of purchase); *Norris v. Church & Co.*, 115 Wn. App. 511, 515, 63 P.3d 153 (2002) (concluding that knowledge of a defect is measured at the time of sale).

[14] Ford maintains that the PSRs of the pre-2016 models of the High Risk Class Vehicle ████████ ████████████████████████████████████████████████████████████████

Expert Report (docket no. 98 at 21) (sealed).  The claim rates for other Class Vehicles show ███████████████ during the same time period, suggesting that the PSR issue was █████████████████████████████████████. *See* Padmanaban Expert Report (docket no. 97 at 17–20).

In light of the Court's conclusion that the PSR defect was not common to all Class Vehicles, as well as evidence of Ford's evolving knowledge of different PSR issues in different Class Vehicle makes, models, and model years, the Court concludes that common evidence cannot establish when Ford learned of a PSR defect for all Class Vehicles.  *See Cooper v. Firestone Tire & Rubber Co.*, 945 F.3d 1103, 1105 (9th Cir. 1991) ("A showing of substantial similarity is required when a plaintiff attempts to introduce evidence of other accidents as direct proof of negligence, a design defect, or notice of the defect."); *see also Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1145–46 (9th Cir. 2012) (concluding that plaintiffs failed to plausibly allege defendant knew of a laptop defect despite allegations of customer complaints and the fact that defendant had been sued relating to another laptop model's defect).  To be sure, Plaintiffs' evidence is sufficient to show that a triable fact exists on whether Ford knew of a PSR defect in Plaintiffs' 2013 Ford Escape.  *See* Mem. Dispo. (docket no. 237 at 6).  That evidence, however, does not sufficiently demonstrate that Ford knew of a PSR defect in all of the Class Vehicles at or around the same time, or that Ford's knowledge of one Class Vehicle's PSR defect can be reasonably imputed to all other Class Vehicles' PSRs.  The

---

███████████████████████████████████████. *See* Taylor Expert Report (docket no. 98 at 21) (sealed).

Court finds that individualized inquiry is necessary to determine if and when Ford knew of a PSR defect for each Class Vehicle.

### c.     Common Damages

Plaintiffs argue that their experts have developed a conjoint damages model that is consistent with their theory of liability and capable of calculating classwide damages as a percentage reduction in Class Vehicles' market value attributable to the PSR defect. Plaintiffs further argue that, even if their conjoint model is imperfect, they "propose a valid method for calculating damages consistent with their theory of liability, which is all that is required."  Reply (docket no. 136 at 14).

"Uncertainty regarding class members' damages does not prevent certification of a class as long as a valid method has been proposed."  *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1182 (9th Cir. 2017), *rev'd on other grounds*, 139 S. Ct. 710 (2019). Still, Plaintiffs must show that "damages are capable of measurement on a classwide basis" in order to "show Rule 23(b)(3) predominance," i.e., that "[q]uestions of individual damages calculations will [not] inevitably overwhelm questions common to the class." *See Comcast*, 569 U.S. at 34 (concluding that plaintiffs' "model [fell] far short of establishing that damages are capable of measurement on a classwide basis" and that absent another methodology, they could not satisfy Rule 23(b)(3)'s predominance requirement).  The Court concludes that Plaintiffs have not made this showing.

Apart from the methodological shortcomings in Plaintiffs' proposed conjoint model,[15] the Court concludes that the model is not capable of accurately measuring damages for certain class members.  Plaintiffs' proposed class includes "all persons in Washington who purchased or leased" a Class Vehicle, including persons who have since sold such vehicles ("Former Class Vehicle Owners").  Plaintiffs' proposed conjoint model will measure Former Class Vehicle Owners' damages at the original point of sale because, according to Plaintiffs, "used vehicle resale data . . . would not reflect a consumer's knowledge of the [d]efect," as the "automobile dealer will not permit the [d]efect to drive down the resale price."  Reply (docket no. 215 at 3–5).  Assuming that Plaintiff is correct that the PSR defect never actually drove down the resale price of Class Vehicles, which is bolstered by Ford's expert's opinion, *see* McCrary Expert Report at ¶¶ 58, 59 (docket no. 94), then the Former Class Vehicle Owners would not have suffered any damages at all because they would have passed on any overpayment at the original point of sale to the Class Vehicle's unwitting new owner.  Calculating damages based on this proposed conjoint model would thus result in a windfall for Former Class Vehicle Owners; and Plaintiffs have not otherwise explained how they would account for such a windfall, despite Ford previously raising the issue.  *See* Def.'s Resp. to Mot. to Exclude McCrary (docket no. 156 at 6).

Because Plaintiffs have not proposed a valid damages model that accounts for potential windfalls to Former Class Vehicle Owners, Plaintiffs have not persuaded the

---

[15] Specifically, the proposed conjoint survey appears to improperly characterize the alleged defect and use an overinflated defect rate.

Court that damages resulting from a PSR defect "are capable of [classwide] measurement and will not require labyrinthine individual calculations." *Comcast*, 569 U.S. at 37.

### d.    Other Common Issues

Plaintiffs also point to other issues that are common to the class, namely whether a PSR shattering event would be material to a reasonable consumer and, for purposes of the CPA claim, whether Ford's conduct occurred in trade or commerce or impacts the public interest. The Court agrees that these issues are common to the class, but they still do not outweigh the noncommon issues at the heart of this litigation—whether each Class Vehicle's PSR is defective, whether Ford knew about the defect and failed to disclose it, and whether Plaintiffs and the other owners of the Class Vehicles were injured as a result of Ford's conduct. Plaintiffs have not met their burden to show that the common factual issues in this case predominate over individualized ones.

### ii.    Superiority

Finally, Rule 23(b)(3) requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." In this case, certain class members, e.g., owners of High Risk Class Vehicles or those who have suffered actual damages, have an interest in pursuing their claims through individual actions. *See* Fed. R. Civ. P. 23(b)(3)(A). Further, the individualized factual issues in this case would make it difficult to manage a class action and undesirable to concentrate the litigation of claims in one forum. *See* Fed. R. Civ. P. 23(b)(3)(C), (D). "A district court that 'has doubts about whether the requirements of Rule 23 have been met should refuse

certification until they have been met.'"  *Olean*, 993 F.3d at 793 (quoting *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1233–34 (11th Cir. 2016)).

Although Rule 23(a)'s requirements are satisfied in this case, Plaintiffs have not met their burden under Rule 23(b)(3) to demonstrate that the issues common to class members predominate over any issues affecting only individual members, or that a class action is superior to other available methods of adjudication.  The Court DENIES Plaintiffs' motion for class certification, docket no. 68.

> **E.      Rule 23(c)(4)**

The Court also denies Plaintiffs' alternative request to certify certain "common" issues under Rule 23(c)(4), as it concludes that these issues are not common:  The question of whether the PSR is defective involves individualized factual issues with respect to each Class Vehicle make, model, and model year, requiring further individualized inquiries as to which Class Vehicles' PSRs Ford might have known were defective and when Ford might have known such information.

## Conclusion

For the foregoing reasons, the Court ORDERS:

(1)      Plaintiffs' motion to exclude Defendant's expert Dr. Paul Taylor, docket no. 108, is DENIED;

(2)      Plaintiffs' motion to exclude Defendant's expert Dr. Justin McCrary, docket no. 114, is DENIED;

(3)      Defendant's motion to exclude Plaintiffs' expert Neil Hannemann, docket no. 122, is DENIED;

(4)     Defendant's motion to exclude Plaintiffs' expert Steven Gaskin, docket no. 124, is DENIED;

(5)     Defendant's motion to exclude Plaintiffs' expert Colin Weir, docket no. 126, is DENIED;

(6)     Defendant's motion to exclude Plaintiffs' expert Dr. Thomas Read, docket no. 131, is GRANTED;

(7)     Plaintiffs' motion for class certification, docket no. 68, is DENIED; and

(8)     The Clerk is directed to send a copy of this Order to all counsel of record.

IT IS SO ORDERED.

Dated this 8th day of July, 2021.

Thomas S. Zilly
United States District Judge

ORDER - 35