1

2

3

4

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

5

6  JACOB BEATY; and JESSICA
   BEATY,

7                    Plaintiffs,                    C17-5201 TSZ

8           v.                                       ORDER

9  FORD MOTOR COMPANY,

10                   Defendant.

11         THIS MATTER comes before the Court on plaintiffs' motion, docket no. 284, for

12  a certification, pursuant to 28 U.S.C. § 1292(b), to allow an interlocutory appeal of (i) the

13  Order entered July 8, 2021, docket no. 243, denying plaintiffs' motion for class

14  certification, docket no. 68, and granting defendant's motion to exclude the testimony of

15  plaintiffs' expert Thomas L. Read, Ph.D., docket no. 131; and (ii) the Minute Orders

16  entered May 26, 2022, and September 30, 2022, docket nos. 264 and 268, respectively,

17  granting in part defendant's motion for summary judgment, docket no. 257, as to three of

18  plaintiffs' theories of damages.  In their motion, plaintiffs cited *Johnson v. Nissan North*

19  *America, Inc.*, No. 17-cv-517, 2022 WL 2869528 (N.D. Cal. July 21, 2022), which was

20  decided after this Court denied class certification and ruled that Dr. Read had "not

21  employed any reliable methodology" to support his opinion that the panoramic sunroofs

22  ("PSRs") in the Ford vehicles at issue suffered from a common defect.  *See* Order at 18

23

ORDER - 1

(docket no. 243).  With respect to PSRs in certain Nissan models, the court in <u>*Johnson*</u> reached a different conclusion with respect to Dr. Read's testimony.  <u>*See*</u> 2022 WL 2869528, at \*11–12.  In <u>*Johnson*</u>, Judge William H. Orrick ruled that Dr. Read's opinions were "sufficiently well explained in his report that any [reliability] issues . . . go to weight and are for the jury to assess." <u>*Id.*</u> at \*11.  In advance of and during a virtual status conference conducted on February 3, 2023, the Court provided notice to the parties that it was inclined to sua sponte reconsider its earlier exclusion of Dr. Read in light of the <u>*Johnson*</u> decision, and the parties were provided an opportunity to submit briefs on the subject.  <u>*See*</u> Minutes (docket no. 292); <u>*see*</u> Def.'s Supp. Br. (docket no. 303); Pls.' Supp. Br. (docket no. 304).  Having now considered all papers filed and the oral arguments presented by counsel at the virtual hearing held on February 9, 2023, the Court enters the following order.

**Discussion**

**A.    Expert Testimony**

The federal rule governing the testimony of expert witnesses provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In 2000, Rule 702 was amended in response to _Daubert v. Merrell_

_Dow Pharmaceuticals, Inc._, 509 U.S. 579 (1993), and its progeny.  _See_ Fed. R. Evid. 702

advisory committee note to 2000 amendment.[1]  _Daubert_ articulated several factors[2] to

consider in assessing the reliability of _scientific_ expert testimony, but those factors are

neither exclusive nor dispositive, and they have not been "codified" in Rule 702.  _Id._

Based on jurisprudence pre- and post-dating _Daubert_, the 2000 advisory committee

outlined the following considerations:

> (1) Whether experts are "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying."
>
> (2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion.
>
> (3) Whether the expert has adequately accounted for obvious alternative explanations.
>
> (4) Whether the expert "is being as careful as he would be in his regular professional work outside his paid litigation consulting."

---

[1] During oral argument, defendant's attorney referenced proposed amendments to Rule 702, which might take effect in December of 2023, but they are not yet in force, and the Court considers them only to the extent that they are consistent with current case law.  _See Sardis v. Overhead Door Corp._, 10 F.4th 268, 283–84 (4th Cir. 2021); _In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig._, No. 05-MD-1720, 2022 WL 15053250, at *4 n.9 (E.D.N.Y. Oct. 26, 2022).

[2] The factors outlined by the _Daubert_ Court are (1) whether the expert's theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the theory or technique when applied; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the theory or technique has been generally accepted in the scientific community. 509 U.S. at 593–94.

(5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

*Id.* (citations omitted).

As the 2000 advisory committee observed, "the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule," and "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *Id.* (citing *United States v. 14.38 Acres of Land Situated in Leflore Cnty., Miss.*, 80 F.3d 1074, 1078 (5th Cir. 1996)); *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").  The 2000 advisory committee further noted that, in some cases, an expert may "educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case.  For example, experts might instruct the factfinder on the principles of thermodynamics, or bloodclotting, or on how financial markets respond to corporate reports, without ever knowing about or trying to tie their testimony into the facts of the case."  Fed. R. Evid. 702 advisory committee note to 2000 amendment.  According to the advisory committee, the 2000 amendment "does not alter the venerable practice of using expert testimony to educate the factfinder on general principles," and, for such "generalized testimony, Rule 702 simply requires that:  (1) the expert be qualified; (2) the testimony address a subject matter on which the factfinder can be assisted by an expert; (3) the testimony be reliable; and (4) the testimony 'fit' the facts of the case."  *Id.*

1        **1.      The Qualifications of Thomas L. Read, Ph.D.**

2        Dr. Read has a bachelor of science degree in metallurgy from the University of

3    Pennsylvania, a master's degree in materials science from Stanford University, and a

4    Ph.D. in materials science and engineering from Stanford University.  _See_ Read Report

5    (Feb. 22, 2019) at ¶ 5 & App. A (docket no. 76-53).  During the early 1970s, he was

6    employed by Corning Glass Works, where he developed finishing processes for glass

7    computer disks and windows for the NASA Space Shuttle.  _Id._ at ¶ 7.  Dr. Read describes

8    himself as a self-employed consultant with expertise, acquired over the past 40 years,

9    concerning glass fracture and glass failure analysis.  _Id._ at ¶ 6.  In its motion to exclude

10   Dr. Read's testimony, defendant did not challenge Dr. Read's qualifications with regard

11   to glass generally or the manner in which different kinds of glass typically fracture;

12   defendant argued merely that Dr. Read is not qualified as an automobile designer.  _See_

13   Def.'s Mot. at 5 & 8 (docket no. 132).  In the previous Order, the Court ruled that

14   Dr. Read is "qualified to opine on general glass failure analysis," _see_ Order at 16 (docket

15   no. 243), and the Court's view concerning Dr. Read's qualifications, which is consistent

16   with Judge Orrick's decision, has not changed.  _See Johnson_, 2022 WL 2869528, at *11.

17       **2.      General Glass Failure Analysis**

18       Dr. Read is qualified to testify about (i) the various types of glass (annealed,

19   laminated, and thermally tempered glass), and (ii) the mechanisms of glass failure.  Thus,

20   the Court reconsiders its previous decision excluding Dr. Read _entirely_ as an expert

21   witness.  The Court now rules that Dr. Read may testify at trial in a manner consistent

22   with the following portions of his report:  Paragraphs 5–8, 12, 13–15, 21–29, 31–41, and

23

45–50.  The Court is satisfied that these paragraphs concern background information and generally accepted scientific principles relating to glass failure.  _See_ Read Report at ¶ 52 (docket no. 76-53) (stating that the summarized procedures for determining the cause of glass failure are "generally accepted in the scientific community" and "have been applied for more than a century").  Permitting Dr. Read to testify about the information described in the above-listed provisions of his report is consistent with the concept that an expert may "educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case."  Fed. R. Evid. 702 advisory committee note to 2000 amendment.  The Court further concludes that the jury will benefit from hearing Dr. Read's primer on thermally tempered glass.  _See_ Fed. R. Evid. 702(a).  And, as essentially conceded by defendant's attorney during oral argument, defendant will not be prejudiced by this ruling, which is being made shortly before trial, given the limited scope of Dr. Read's anticipated testimony, the length of time (three-and-a-half to four years) that defendant has had access to Dr. Read's report, docket no. 76-53, and rebuttal report, docket no. 185-2, the opportunities defendant had to depose Dr. Read, and the preparations already made by defendant's experts to attempt to rebut Dr. Read's opinions.

### 3.     Dr. Read's Opinions About the PSRs in Ford's Vehicles

With regard to Dr. Read's case-specific opinions, the Court is persuaded that its prior ruling was generally appropriate.  Dr. Read opines that the tempered glass in panoramic sunroofs in various Ford models predating plaintiffs' vehicle was substantially similar; the pieces of glass were 4.8–5.0 mm thick, were at least 0.5 $m^2$ in size, had ceramic print (a mix of ceramic frit and polymer binders) painted around their outer

borders, and were attached to unibody frames.  Read Report at ¶¶ 20, 63–64 (docket no. 76-53).  The Court will permit Dr. Read to discuss the features of the PSR glass in plaintiffs' vehicle (a 2013 Ford Escape) and in Ford models with PSR glass of allegedly similar design, but Dr. Read will be precluded from characterizing the various PSRs as containing a "defect" or a "common" or "similar" defect.  Dr. Read will also be allowed to describe the composition of ceramic print, explain its purposes, and discuss how it might interfere with the strength of tempered glass.  He will not, however, be permitted to refer to the ceramic print (or frit) as a "defect" or a "common" or "similar" defect among the various Ford models.  In sum, Dr. Read may testify consistently with the restrictions set forth in this Order and paragraphs 17, 18, 19, 20, 63, and 64 of his report.  Except as specified, Dr. Read's case-specific opinions remain excluded for the reasons provided in the prior Order.  _See_ Order at 14–19 (docket no. 243).

According to Dr. Read, based on its "size, thinness, curvature, ceramic print, and attachment to the unibody frame," the panoramic sunroof glass at issue "is weakened and not capable of withstanding the tensile stresses one would reasonably anticipate, making the glass defective in that it is substantially likely to shatter and not reasonably fit for its intended use and environment."  Read Report at ¶ 65 (docket no. 76-53).  Plaintiffs do not make a products liability claim, and thus, they need not prove, and Dr. Read will not be allowed to testify, that the PSR glass in plaintiffs' or any other Ford vehicle was not "fit for use" or was "defective."

1         Moreover, as noted in the Court's previous Order, with only one exception,[3]

2   Dr. Read has not visually inspected or performed any analysis on the PSR glass in the

3   Ford models at issue.  *See* Order at 17 (docket no. 243).  In contrast, in <u>Johnson</u>, Dr. Read

4   analyzed nineteen (19) shattered sunroofs that had been preserved by Nissan and made

5   available for his inspection.  *See* 2022 WL 2869528, at \*12.  The disagreement in

6   <u>Johnson</u> between Dr. Read, who concluded, on the basis of fractography, that all nineteen

7   glass panels showed progressive failure, and Nissan's expert, who opined that all but

8   three of them had failed immediately, constituted the typical battle of experts meant for

9   jury resolution.  <u>Id.</u>  Fractographical analysis was not conducted in this case, and <u>Johnson</u>

10  is distinguishable.

11        In response to defendant's observation that he had not conducted any relevant

12  experiments, Dr. Read stated that he had "personally performed numerous failure

13  analyses on PSRs made by Webasto and Inalfa, which have been supplied to car

14  manufacturers, such as Ford."  Read Rebuttal Report at 16 (docket no. 185-2).  According

15  to Dr. Read, "[a]ll of the PSR assemblies manufactured by Webasto and Inalfa that [he

16  has] observed and inspected are identical in construction and functionality," and any size

17  or shape differences "are immaterial as they do not affect the common design and

18  functionality of the PSRs."  <u>Id.</u>  Dr. Read did not, however, provide any details

19  concerning his previous studies or provide a factual basis to support any assertion that

20  

---

21  [3] In preparing his rebuttal report, Dr. Read visited a used car lot and examined the PSRs in two
    Ford vehicles, namely a 2016 Explorer and a 2017 Edge.  *See* Read Rebuttal Report at 17–18.

22  Only the former model has a tempered glass PSR.  *See* Stip. & Order (docket no. 65).

23

1   PSR assemblies supplied by Webasto and Inalfa to defendant are identical to those

2   provided to other automobile manufacturers.  Dr. Read's conclusions about Ford's PSRs

3   must be viewed as speculative, premised entirely on assumptions, and unreliable.

4          In denying Nissan's motion to exclude Dr. Read's opinions, Judge Orrick

5   indicated that "some portions of Read's deposition do indeed give me pause," but he

6   decided to allow a jury to determine the weight to be given to Dr. Read's testimony.

7   2022 WL 2869528, at *11.  An interlocutory appeal is now pending in <u>Johnson</u>, but the

8   extent to which the Ninth Circuit might review the merits of Judge Orrick's evidentiary

9   ruling is unclear.  Like Judge Orrick, this Court has struggled with the admissibility of

10  Dr. Read's testimony, but it has ultimately concluded that, although Dr. Read may testify

11  generally about glass, glass failure, glass failure analysis, and the features of tempered

12  glass in Ford's PSRs, he will not be permitted, in plaintiffs' case-in-chief, to provide

13  opinions concerning any "defects" or "common" or "similar" defects in the Ford models

14  at issue or about how or why the PSR glass in such vehicles failed.

15      **4.      <u>Rebuttal Testimony</u>**

16          In his rebuttal report, Dr. Read repeated some of the content of his report dated

17  February 22, 2019, and the Court's rulings in connection with the original report apply

18  equally to the duplicative portions of the rebuttal report.  In addition, Dr. Read criticized

19  (i) ball-drop and Sarbacane testing conducted by defendant's experts, which do not

20  replicate "real world driving conditions," Read Rebuttal Report at 25–28 (docket no. 185-

21  2), and (ii) an analysis performed by defendant's expert Paul M. Verghese, Ph.D. of a

22

23

1   fractured PSR in a 2016 Lincoln MKZ belonging to Paul Howd, *see id.* at 28–34.[4]  If

2   defendant's experts testify about the ball-drop and/or Sarbacane testing and/or the

3   conclusions drawn from inspecting Mr. Howd's Lincoln MKZ, the Court will then decide

4   whether Dr. Read will be permitted to testify about those topics in a manner that is

5   consistent with his rebuttal report.

6   **B.**     **Interlocutory Appeal**

7           If the Court is "of the opinion that [an] order involves a controlling question of

8   law as to which there is substantial ground for difference of opinion and that an

9   immediate appeal from the order may materially advance the ultimate termination of the

10  litigation," the Court may "so state in writing," and the Ninth Circuit "may thereupon, in

11  its discretion, permit an appeal to be taken from such order," if application is timely

12  made.  28 U.S.C. § 1292(b).  With respect to the Court's denial of class certification, the

13  Ninth Circuit has already denied plaintiffs' petition pursuant to Federal Rule of Civil

14  Procedure 23(f).  *See* 9th Cir. Order (docket no. 251).  Nothing has changed since then,

15  and none of the usual reasons for allowing an interlocutory appeal are present in this case.

16  *See Chamberlain v. Ford Motor Co.*, 402 F.3d 952, 959 (9th Cir. 2005) ("Review of class

17

18  ─────────────────────

19  [4] Mr. Howd's 2016 Lincoln MKZ experienced a PSR glass fracture in 2015; the replacement
    glass also failed in March 2018, when the vehicle had roughly 37,000 miles.  Verghese Report at
20  36 (docket no. 99).  Dr. Verghese inspected the fractured replacement glass on May 18, 2018,
    when it was still in the vehicle.  *Id.*  Dr. Verghese has opined that Mr. Howd's replacement glass
21  "fractured at the moment it was struck by an external impact."  *Id.* at 40.  Whether Dr. Verghese
    will be allowed to testify at trial about his analysis of Mr. Howd's broken PSR is the subject of a
22  separate motion currently pending before the Court.  *See* Pls.' Mot. in Limine No. 2 (docket
    no. 288).

23

ORDER - 10

1   certification decisions will be most appropriate when:  (1) there is a death-knell situation

2   for either the plaintiff or defendant that is independent of the merits of the underlying

3   claims, coupled with a class certification decision by the district court that is

4   questionable; (2) the certification decision presents an unsettled and fundamental issue of

5   law relating to class actions, important both to the specific litigation and generally, that is

6   likely to evade end-of-the-case review; or (3) the district court's class certification

7   decision is manifestly erroneous.").

8         As to the Court's decision concerning Dr. Read's testimony, plaintiffs have not

9   identified a "controlling question of law" or a "substantial ground for difference of

10  opinion."  *See* *Couch v. Telescope Inc.*, 611 F.3d 629, 633 (9th Cir. 2010) ("That settled

11  law might be applied differently does not establish a substantial ground for difference of

12  opinion.").  The Court's rulings on sua sponte reconsideration bring this matter in line

13  with the case law interpreting Rule 702, as reflected in the advisory committee notes to

14  the 2000 amendment, as well as Judge Orrick's decision in *Johnson*, and an interlocutory

15  appeal would not "materially advance," but rather would simply unnecessarily delay "the

16  ultimate termination of the litigation."  *See* 28 U.S.C. § 1292(b).[5]

17  **Conclusion**

18        For the foregoing reasons, the Court ORDERS:

19        (1)     Plaintiffs' motion, docket no. 284, for certification of an interlocutory

20  appeal, is DENIED;

21  _____

22  [5] For similar reasons, the Court declines to certify the damages issues for interlocutory appeal.

23

(2)     The portion of the Order entered July 8, 2021, docket no. 243, a redacted version of which was filed on July 22, 2021, docket no. 245, excluding the testimony of Dr. Read is AMENDED as follows.  Defendant's motion, docket no. 132 (sealed) and docket no. 131 (redacted), is GRANTED in part and DENIED in part, and Dr. Read will be permitted to offer opinions at trial that are consistent with this Order; and

(3)     The Clerk is directed to send a copy of this Order to all counsel of record.

IT IS SO ORDERED.

Dated this 10th day of February, 2023.

Thomas S. Zilly
United States District Judge

ORDER - 12